## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

AMERICAN MEDICAL ASSOCIATION, on behalf )
of itself and its members, ACCESS INDEPENDENT )
HEALTH SERVICES, INC., d/b/a RED RIVER )
WOMEN'S CLINIC, on behalf of itself, its )
physicians, and its staff, and KATHRYN L. )
EGGLESTON, M.D., )
)
                                Plaintiffs, )
)
v. )
)
WAYNE STENEHJEM, in his official capacity as )
Attorney General for the State of North Dakota, and )
BIRCH BURDICK, in his official capacity as State )
Attorney for Cass County, as well as their employees, )
agents, and successors, )
)
                                Defendants. )

CIVIL ACTION

CASE NO. _1:19-cv-125_

## COMPLAINT

      Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the above-named Defendants, their employees, agents and successors in office, and in support thereof allege the following:

## I. PRELIMINARY STATEMENT

      1.     Plaintiffs bring this civil rights action under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 to challenge the constitutionality of North Dakota House Bill 1336 of 2019 (hereinafter the "Compelled Reversal Mandate" or "H.B. 1336") and N.D. Cent. Code § 14-02.1-02(11)(a)(2) (hereinafter the "Compelled Personhood Mandate"), which compel physicians and their agents to speak government-mandated messages that entail providing to their patients misleading or even patently false, non-medical information with which

they disagree (collectively, the "Compelled Speech Laws"). H.B. 1336 will be codified as amendments to N.D. Cent. Code § 14-02.1-02(11) and a new subsection of N.D. Cent. Code § 14-02.1-02.1(1). A copy of H.B. 1336 is attached hereto as Exhibit A. The Compelled Personhood Mandate is already in effect, and the Compelled Reversal Mandate (H.B. 1336) is scheduled to take effect on August 1, 2019.

2.      The Compelled Reversal Mandate forces physicians to tell their patients that medication abortion may be reversible, a claim wholly unsupported by the best, most reliable scientific evidence, contravening their ethical and legal obligations as medical providers. The Compelled Personhood Mandate forces physicians to also tell their patients that abortion terminates "the life of a whole, separate, unique, living human being," compelling medical providers to convey a controversial and ideological message about fetal personhood that is unmoored from medical science. Plaintiffs object to this forced speech, which requires physicians to deliver to their patients false, misleading, non-medical information with which they disagree, to advertise an experimental treatment that runs counter to their patients' best interests, and to violate their medical ethics.

3.      Just last term, the United States Supreme Court held in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*") that candor is crucial in the patient-provider relationship, and that the government cannot regulate the speech of medical professionals to advance controversial ideas or to discriminate based on the content and/or viewpoint of the speaker. But this is precisely what the Compelled Speech Laws do. Indeed, the Compelled Speech Laws not only force physicians to provide patients with government messages with which they disagree and to refer patients to government-sanctioned services (like the law at issue in *NIFLA*), but the laws also compel physicians to *personally speak* these government-sanctioned messages.

2

More than that, the Compelled Speech Laws force physicians to speak out loud messages that are scientifically unsupported and that may subject physicians to ethical and legal liability. Ultimately, both messages will force physicians to violate their medical ethics and unnecessarily inflict harm on their patients.

4.      To protect physicians from these constitutional violations, and to avoid irreparable harm, Plaintiffs seek declaratory and injunctive relief to prevent enforcement of the Compelled Speech Laws.

## II.  JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 42 U.S.C. § 1983.

6.      Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in this district and the Defendants are located and carry out their official duties in this district.

## III.  PARTIES

### A.  Plaintiffs

8.      Plaintiff American Medical Association ("AMA") is the largest professional association of physicians, residents, and medical students in the United States. The AMA is an Illinois not-for-profit corporation headquartered in Chicago, Illinois. All of the state medical associations and most of the major specialty medical societies are represented in the AMA House

of Delegates, with the AMA serving as the overall umbrella and voice of organized medicine in the United States.

9.     The AMA represents virtually all United States physicians, residents, and medical students through its policymaking process. AMA members practice and reside in all States, including North Dakota. AMA members practice in all areas of medical specialization, and AMA members provide patients with family planning services and procedures, including abortions.

10.     The objectives of the AMA are to promote the science and art of medicine and the betterment of public health. Since its founding in 1847, the AMA has played a crucial role in the development of medicine in the United States.

11.     Also since 1847, the AMA has published the *Code of Medical Ethics of the American Medical Association*. This was the first modern national medical ethics code in the world and continues to be the most comprehensive and well-respected code for physicians worldwide. All AMA members are required to adhere to the *Code of Medical Ethics*. The federal judiciary, including the Supreme Court of the United States, has repeatedly cited to the *Code of Medical Ethics* as a generally accepted and authoritative source reflecting current scientific thought and standards of care.

12.     Plaintiff Red River Women's Clinic ("the Clinic"), located in Fargo, North Dakota, has been in operation since 1998. The Clinic provides a range of reproductive health care to women, including medication and surgical abortions. Every member of the Clinic's staff acts as an agent for the Clinic's physicians for various purposes, including communications with patients. The Clinic brings claims on behalf of itself, its physicians, and its staff.

4

13.     Plaintiff Kathryn Eggleston, M.D., is a physician licensed to practice medicine in North Dakota. Dr. Eggleston, a member of the AMA, is the Clinic's medical director. She provides both medication and surgical abortions to the Clinic's patients.

### B. Defendants

14.     Defendant Wayne Stenehjem is the Attorney General of the State of North Dakota. The Attorney General must "appear and defend all actions against any state officer," and "advise the several state's attorneys in matters relating to the duties of their office." N.D. Cent. Code §§ 54-12-01.3, 54-12-01.4. He is sued in his official capacity.

15.     Defendant Birch Burdick is the State's Attorney for Cass County where the clinic is located. The State's Attorney's office is charged with prosecuting all public offenses on behalf of the State of North Dakota. N.D. Cent. Code § 11-16-01(1). H.B. 1336 provides criminal penalties. N.D. Cent. Code Ann. § 14-02.1-11. He is sued in his official capacity.

## IV. FACTUAL ALLEGATIONS

### A. Background Facts About Abortion in North Dakota.

16.     Legal abortion is among the safest, most common medical procedures American women undergo. In fact, nearly one in four women in the United States (23.7%) will have had an abortion by the time she is 45 years old.[1] Access to safe and legal abortion benefits the health and wellbeing of women and their families, including women who already have children. Over the past forty years, safe and legal abortion has been important to facilitating women's equal participation in society, including in the economic and social life of the nation.

---

[1] *Induced Abortion in the United States*, Guttmacher, (2018), *available at* https://www.guttmacher.org/fact-sheet/induced-abortion-united-states; *see also The Safety and Quality of Abortion Care in the United States*, National Academy of Sciences, Engineering, Medicine (March 16, 2018), *available at* http://nationalacademies.org/hmd/reports/2018/the-safety-and-quality-of-abortion-care-in-the-united-states.aspx.

17.     Red River Women's Clinic is the principal abortion provider and the only abortion clinic in North Dakota. Abortions are generally unavailable in hospitals and doctors' offices in North Dakota. The Clinic provides abortion care up to approximately sixteen weeks and six days as dated from the first day of a woman's last menstrual period ("LMP").[2] The Clinic serves patients primarily from North Dakota, South Dakota, and Minnesota.

18.     The Clinic's patients obtain abortions for a variety of reasons. Approximately sixty percent already have children and many do not feel they can adequately parent and support additional children. Some younger patients believe that parenthood will prevent completion of their education, which would hinder both their own development and their ability to provide for their children. Other patients seek abortions because they are pregnant as a result of rape, are victims of domestic violence, or because the pregnancy threatens their health.

19.     The Clinic provides its patients with both surgical and medication (i.e. non-surgical) abortion options.

20.     The most common form of medication abortion is a regimen of a combination of two prescription drugs, mifepristone and misoprostol, which are both pills that patients take orally. Mifepristone, also known as "RU-486" or by its commercial name Mifeprex, was first approved by the U.S. Food and Drug Administration ("FDA"), as an effective alternative to surgical abortion in early pregnancy when used in conjunction with misoprostol, in 2000. As with other prescription drugs, the combined use of mifepristone and misoprostol—collectively referred to as "medication abortion"—is regulated by the FDA.

---

[2] Pregnancy is commonly measured from the first day of a woman's last menstrual period ("LMP"). Fertilization typically occurs around two weeks LMP. Pregnancy is generally considered to begin around three weeks LMP, when a fertilized egg typically implants in the uterus. Pregnancy typically lasts until forty weeks LMP.

21.     Mifepristone works first by temporarily blocking the hormone progesterone, which is necessary to maintain pregnancy, and by increasing the efficacy of the second medication in the regimen, misoprostol. Misoprostol, which is taken 24 to 48 hours after mifepristone, causes the uterus to contract and expel its contents.

22.     Since 2000, over three million women in the United States have had a medication abortion.[3]

23.     The FDA updated the drug label for mifepristone in 2016 to bring it up to date with the current evidence-based protocol used by medical professionals for the provision of medication abortion.[4] As provided by the 2016 label, the protocol for administration of medication abortion is as follows: on day 1, the patient takes 200 mg of mifepristone orally; twenty-four to forty-eight hours later, the patient takes 800 mcg of misoprostol buccally (meaning, held inside the cheek while the pills dissolve). The 2016 label approves the use of medication abortion through seventy days, or ten weeks LMP.

24.     This protocol, as the FDA has found, is extremely safe and effective in terminating pregnancy.[5]

25.     As with other drugs, administration of medication abortion according to any protocol that deviates from the 2016 label, or omits any information or steps contemplated in the 2016 label, is considered "off-label."

---

[3] *Mifeprex Effectiveness and Advantages*, Danco Laboratories (last visited June 17, 2019), https://www.earlyoptionpill.com/is-mifeprex-right-for-me/effectiveness-advantages/.

[4]     FDA Label for Mifeprex, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[5] *Id.* at Table 3.

26.    Both surgical abortion and medication abortion will fail to terminate pregnancy in a small minority of cases. According to the FDA, the success rate for medication abortion in the United States, when administered using mifepristone and misoprostol in accordance with the 2016 label protocol, is 97.4%.[6]

27.    The standard of medical care before starting any abortion procedure is for physicians to counsel their patients to be certain in their decision to terminate their pregnancies.

28.    Although mifepristone on its own is not considered effective in ending a pregnancy by the FDA or by the medical community more broadly, Plaintiffs counsel their patients to be certain in their decision to terminate their pregnancies before starting the mifepristone/misoprostol regimen because mifepristone alone will cause termination in a significant percentage of pregnancies.

**B. North Dakota's Existing Government-Mandated Speech Requirements for Physicians.**

29.    North Dakota has an existing scheme of speech requirements that abortion providers or their agents (collectively "Physicians") must follow during pre-abortion counseling as a precondition to providing either surgical or medication abortion. The law uses the catch-all phrase "informed consent" to describe the entire scheme of government-mandated speech requirements, although only some of the requirements are related to the process of a patient's receiving information about the details, risks, and benefits of the procedure and its alternatives to provide informed consent to that medical procedure.

30.    North Dakota law divides its government-mandated speech requirements for Physicians into two categories: (1) information that Physicians must orally tell their patients; and

---

[6] *Id.*

(2) printed materials written by the North Dakota State Department of Health ("DOH") that Physicians must affirmatively give to their patients.

31.  The government-mandated information that Physicians must orally provide to their patients includes the information necessary to obtain the patient's voluntary and informed consent, namely:  (1) medically accurate information about the medical risks associated with the particular abortion procedure to be employed; (2) the probable gestational age of the fetus at the time of the abortion; and (3) the medical risks associated with carrying a child to term. N.D. Cent. Code § 14-02.1-02(11)(a)(3) through (5).

32.  The remainder of the existing government-mandated information Physicians must orally tell their patients, including the Compelled Personhood Mandate, are unrelated to the process of obtaining the patient's informed consent for a particular medical procedure. The Compelled Personhood Mandate compels Physicians to inform their patients that: "The abortion will terminate the life of a whole, separate, unique, living human being." N.D. Cent. Code § 14-02.1-02(11)(a)(2). This statement is medically unrelated to the process of obtaining a patient's informed consent for an abortion. Rather, this statement forces Physicians to speak the State's controversial and ideological opinion about when life begins.

33.  North Dakota's Abortion Control Act defines "human being" as "an individual living member of the species of homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation." N.D. Cent. Code § 14-02.1-02(9). This ideologically contrived, legalistic definition deviates from medical terminology, as medicine does not and cannot answer the question of when, during the course of embryonic and fetal development, human life begins.

34.     North Dakota law also requires that "[t]he state department of health shall publish in English, and in every other language that the department determines is the primary language of a significant number of state residents" printed materials that Physicians must affirmatively give to their patients. N.D. Cent. Code § 14-02.1-02.1(1). The current printed materials—not challenged here—force Physicians to give their patients information about various government-sponsored resources and medical information for pregnant patients.

35.     Before a physician performs an abortion, he or she must receive certification in writing from the patient that the patient has provided her "informed consent as defined and provided in section 14-02.1-02." N.D. Cent. Code § 14-02.1-03(1).

36.     In performing pre-abortion counseling, Physicians are guided not only by their legal obligations, but by their ethical obligations to provide candid, complete, and accurate information to their patients about their health status and all medically relevant health care options. As required by North Dakota, this discussion begins at least 24 hours before the patient's procedure, when Physicians discuss with the patient—either over the phone or in person—the patient's options and alternatives (including carrying the pregnancy to term, adoption, and abortion), and the abortion procedures that are available to her depending on the gestational age of the pregnancy and her medical history. While these discussions begin when the patient first contacts the clinic to schedule an appointment, they continue throughout the patient's interactions with the clinic, up to the time when the patient's abortion procedure begins.

37.     As part of that pre-abortion counseling, Physicians also perform the specific task of obtaining the patient's "informed consent" to a specific medical or surgical abortion procedure. The informed consent process includes describing the risks, benefits, and medical details associated with each procedure to the patient so that she can provide informed consent to the

specific procedure she chooses. Physicians' ethical and legal obligations thus include, but are not limited to, obtaining informed consent from the patient.

38.     Informed consent, as understood within the medical profession, does not follow a rigid, governmentally proscribed protocol. It is a give and take between an individual patient and an individual physician. It is based on trust and open, forthright communication, intended to further the patient's understanding of her medical care. Recitation of a government-scripted message unrelated to her actual medical care only hinders that process. The purpose of informed consent is to further the interests of the patient—not to further political objectives.

39.     Physicians advise each of their patients that the decision to have an abortion is hers alone to make, and not to start an abortion, medication or surgical, unless and until she is firm in her decision to terminate the pregnancy. The overwhelming majority of the Clinic's patients are sure of their decision to obtain an abortion by the time they call the clinic to schedule their abortion procedure. In rare cases where a patient arrives for her procedure undecided or ambivalent about the decision to obtain an abortion, the Clinic will instruct the patient to return for the procedure only if and when she has definitively made up her mind to obtain an abortion.

**C. The Challenged Compelled Speech Laws.**

40.     The Compelled Personhood Mandate violates Plaintiffs' right to freedom of speech by compelling Physicians to speak a controversial and ideological message with which Plaintiffs disagree and that is unmoored from medical science. The Compelled Personhood Mandate forces Physicians to act as the government's mouthpiece to speak a message that is unrelated to the medical details, risks, and benefits of the procedure. Thus, the Compelled Personhood Mandate falls outside the realm of true informed consent, as it fails to provide patients with relevant information regarding the nature of the abortion procedure or its risks or benefits.

11

41.     Instead, the Compelled Personhood Mandate compels Physicians to speak the State's controversial and ideological opinion about when life begins to further the State's attempt to discourage abortion. Effectively, through the Compelled Personhood Mandate, the State attempts to use Physicians to indoctrinate, shame, and stigmatize patients seeking abortion.

42.     Supreme Court precedent, including *NIFLA*, makes clear that the government cannot co-opt provider-patient speech and force medical professionals to supply their patients with any government message, much less a controversial and/or ideological message, without violating the free speech rights of the physicians.

43.     The Compelled Reversal Mandate radically amends North Dakota's scheme of government-mandated speech requirements for Physicians in ways that are inconsistent with existing North Dakota law and with Plaintiffs' right to freedom of speech.

44.     North Dakota Law provides that a physician may only provide, prescribe, or administer abortion-inducing drugs (a.k.a. medication abortion) if such "provision or prescription of the abortion-inducing drug satisfies the protocol tested and authorized by the federal food and drug administration and as outlined in the label for the abortion-inducing drug." N.D. Cent. Code Ann. § 14-02.1-03.5(2). H.B. 1336 neither amends nor references this provision of North Dakota law.

45.     Rather, H.B. 1336 amends N.D. Cent. Code § 14-02.1-02(11) to require that "the physician or the physician's agent, at least twenty-four hours before the abortion" orally tell all patients seeking abortion, *regardless of whether they are seeking medication or surgical abortion*, the following: "That it may be possible to reverse the effects of an abortion-inducing drug if she changes her mind, but time is of the essence, and information and assistance with reversing the

effects of an abortion-inducting drug are available in the printed materials given to her as described in section 14-02.1-02.1."

46.    H.B. 1336 also adds a new subdivision to the statute detailing the government-created printed materials that physicians or their agents must affirmatively give to their patients. The printed materials must now also include: "Materials including information it may be possible to reverse the effects of an abortion-inducing drug but time is of the essence. The materials must include information directing the patient where to obtain further information and assistance in locating a medical professional who can aid in the reversal of abortion-inducing drugs, such as mifepristone and misoprostol."

47.    Although H.B. 1336 refers to misoprostol as an abortion-inducing drug, the North Dakota Supreme Court has explicitly found that "misoprostol is not an abortion-inducing drug." *MKB Management Corp. v. Burdick*, 855 NW 2d 31, 49 (2014).

48.    While H.B. 1336 directs DOH to add information about "reversal of abortion-inducing drugs" to its printed materials, it does not proscribe a corresponding deadline, and to date, DOH has not yet done so.

49.    Any physician who performs an abortion in violation of the North Dakota Abortion Control Act (which includes both the Compelled Reversal Mandate and the Compelled Personhood Mandate) is subject to criminal penalties. N.D. Cent. Code Ann. § 14-02.1-11. North Dakota law also provides that patients may seek civil damages, including punitive and treble damages, against physicians for lack of "informed consent." N.D. Cent. Code Ann. § 14-02.1-03.2.

50.    The two provisions of the Compelled Reversal Mandate compel Physicians to (1) orally inform their patients that "it may be possible to reverse the effects of an abortion-inducing drug" and (2) affirmatively direct their patients to government-created printed materials that

convey the same message and then "direct[] the patient where to obtain further information and assistance in locating a medical professional who can aid in the reversal of abortion-inducing drugs, such as mifepristone and misoprostol."

51.     Together, the Compelled Reversal Mandate and the Compelled Personhood Mandate force Physicians to speak medically inaccurate messages with which they disagree and that are unrelated to the process of obtaining informed consent from their patients to a particular abortion procedure.

**D. Facts about So-Called "Reversal of Abortion-Inducing Drugs."**

52.     There is no credible evidence that a medication abortion administered via the combined mifepristone/misoprostol regimen can be reversed.

53.     Indeed, once an abortion has occurred, whether by medication abortion or by any other means, a woman is no longer pregnant, which cannot be reversed.

54.     As the Legislature considered and debated the Act, several witnesses testified about an experimental practice proposed by a physician in San Diego, who believes he can "reverse" the effects of *mifepristone* prior to administration of misoprostol.

55.     Upon information and belief, one physician in North Dakota, and a small number of other physicians elsewhere, have experimented with this practice, which involves either injecting or prescribing large doses of progesterone to patients who have taken mifepristone, but have not yet taken misoprostol, the second drug in the medication abortion regimen. While there is no consensus on the protocol for these doses of progesterone, this small number of physicians has experimented with weekly injections, in some cases until the end of pregnancy, as well as oral and vaginal routes of progesterone administration.

56.     Progesterone injections are typically administered by a physician, while oral and vaginal progesterone, available by prescription only, can be administered by the patient. Although progesterone is generally considered a low-risk medication, it does carry risks. Progesterone has been associated with maternal complications such as depression, cholestatic jaundice, and hypertension. And while some data support the general safety of progesterone in pregnancy, other studies have raised concerns about possible associations with second trimester miscarriage, stillbirth, and certain birth defects.[7]

57.     Progesterone has not been approved by the FDA for use in "reversing" the effects of mifepristone or any other abortion-inducing drug.

58.     The fact that there are physicians experimenting with using progesterone to counteract mifepristone does not constitute credible, medically accepted evidence that the experimental practice is effective or safe.

59.     This experimental practice is opposed by the nation's leading women's medical association, the American Congress of Obstetricians and Gynecologists ("ACOG"),[8] as well as the North Dakota section of ACOG, because its safety and efficacy have not been established.

60.     The legislature received testimony opposing H.B. 1336 from the North Dakota Section of ACOG, whose members object to being forced to provide patients with information about "reversal," as its safety and effectiveness is unproven and it thus does not meet clinical standards.

---

[7] *See, e.g.*, Paul J. Meiss et al., *Prevention of Recurrent Preterm Delivery by 17 Alpha-Hydroxyprogesterone Caproate*, 348 N. Eng. J. Med. 2379, 2382 (2003); Suzan L. Carmichael et al., *Maternal Progestin Intake and Risk of Hypospadias*, 159(10) Archives of Pediatric & Adolescent Med. 957 (2005).

[8] ACOG is also known as the American College of Obstetricians and Gynecologists.

61.     Medication abortion is more effective when both mifepristone and misoprostol are used together because mifepristone alone will not always cause abortion. As ACOG has recognized, as many as half of women who take only mifepristone continue their pregnancies.[9]

62.     There is no FDA-approved protocol for the administration of progesterone after mifepristone to reverse its effects, nor is there an FDA protocol for any other method of medication abortion "reversal."

63.     There is zero evidence, and no witness who testified in the legislature claimed, that the effects of *misoprostol*, or any other abortion-inducing drugs other than mifepristone (as discussed above), can be reversed.

64.     Because there is no credible, scientific evidence that a medication abortion can be reversed, Physicians do not and cannot, without misleading them, tell their patients that it may be possible to reverse a medication abortion. Similarly, Physicians do not tell their patients that information and assistance is available to reverse a medication abortion, and Physicians could not do so without misleading their patients.

## V. THE IMPACT OF THE COMPELLED SPEECH LAWS ON PHYSICIANS

65.     The Compelled Speech Laws compel Physicians, unwillingly and against their best medical judgment, to orally convey to their patients content-based and viewpoint-based government-mandated messages and affirmatively direct their patients to government-created materials and referral information, with which Plaintiffs and the overwhelming consensus of the medical profession vehemently disagree.

---

[9] Statement of the American Congress of Obstetricians and Gynecologists, *Facts Are Important: Medication Abortion "Reversal" Is Not Supported by Science* (Aug. 2017), *available at* https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantMedicationAbortionReversal.pdf?dmc=1&ts=20180206T1955451745.

66.    The Compelled Speech Laws also compel Physicians, against their best medical judgment, to orally endorse controversial and ideological ideas and advertise to their patients an experimental practice that violates the standard of care.

67.    By compelling Physicians to speak and otherwise provide their patients with information, materials, and referrals that are not medically credible or scientifically established, the Compelled Speech Laws force Physicians to violate their ethical obligations to their patients and undermine the establishment of a relationship of trust and confidence between a patient and her physician.

68.    Specifically, by forcing Physicians to tell their patients that abortion terminates "the life of a whole, separate, unique, living human being," the Compelled Personhood Mandate forces Physicians to endorse a controversial and ideological government message which misleads patients, which is unmoored from the scientific facts relevant to the patient's need to consent to abortion, and which shames and stigmatizes the patients' decision to seek an abortion. Accordingly, the Compelled Personhood Mandate forces physicians to violate their ethical duties to their patients by inflicting emotional harm on their patients with no corresponding medical benefit.

69.    The Compelled Personhood Mandate also forces Physicians to take sides in an ideological debate and use their own voices to further the State's message about discouraging abortion.

70.    Similarly, by forcing Physicians to discuss "revers[ing] the effects of an abortion-inducing drug" and to direct their patients to DOH materials that include referrals to "a medical professional who can aid in the reversal of abortion-inducing drugs, such as mifepristone and misoprostol," the Compelled Reversal Mandate forces them to provide their patients with

information that is untruthful, misleading, and irrelevant to their medical decision-making. As to reversal of "misoprostol" specifically, the Compelled Reversal Mandate forces Physicians to tell their patients about a practice which has never even been suggested, let alone supported, by credible scientific literature.

71.     Because the Compelled Reversal Mandate compels Physicians to tell *every* abortion patient about the possibility of reversing a medication abortion, it compels them to convey a state message that is completely irrelevant (in addition to being untruthful or at least misleading) to patients who are only eligible for or interested in a surgical abortion.

72.     The government-mandated message compelled by the Compelled Reversal Mandate also directly contradicts the critical message Physicians seek to convey to their patients: that they must be certain about terminating their pregnancy before they begin the abortion process. Indeed, the Compelled Reversal Mandate forces Physicians to create the risk that a patient will choose to begin an abortion before she is ready to do so, under the mistaken belief that the abortion can be reversed if the patient later chooses.

73.     Not only does this message threaten emotional harm to patients, but it also exposes patients to unknown side effects from an unverified medical procedure. Worst of all, the treatment contemplated by the Compelled Reversal Mandate, by its unproven, experimental nature, risks potential birth defects in children born to patients who might attempt abortion "reversal."

74.     The Compelled Reversal Mandate thus impedes Physicians' ability to provide abortions to their patients under the highest standard of care, compels Physicians to lie to their patients, and potentially forces Physicians to inflict harms on their patients.

75.     The Compelled Reversal Mandate also forces Physicians to discuss and endorse as a legitimate option an off-label use of mifepristone and progesterone to their patients, when North

Dakota law separately requires that physicians only provide medication abortion in accordance with the protocol tested and authorized by the FDA, which does not describe or contemplate a process for reversal. The Compelled Reversal Mandate fails to provide clear guidance to Physicians regarding how to comply with North Dakota law, which is particularly constitutionally suspect given that it threatens the exercise of Physicians' constitutional rights to free speech, imposes criminal penalties, and targets abortion providers who are already are especially vulnerable to arbitrary and discriminatory enforcement of the law.

76.     The Compelled Reversal Mandate places Physicians in an impossible Catch 22—a physician cannot follow one North Dakota law without violating the other—meaning that the Compelled Reversal Mandate does not provide clarity about the conduct it prohibits.

77.     Both of the Compelled Speech Laws alter the content of Plaintiffs' speech to, at best, compel Plaintiffs to speak the government's controversial messages, and at worst, lie to their patients about their options, undermine their patients' ability to consent to medical care, and harm their patients and their patients' future children.

78.     The Compelled Speech Laws also force Physicians, under threat of criminal penalty, to run the risk of civil liability and other repercussions, including potentially malpractice, for lying to their patients and failing to uphold their ethical duties to their patients.

79.     The Compelled Speech Laws distort and undermine the process of informed consent, dictated both by North Dakota law and by professional medical ethics, by forcing Physicians to provide their patients with confusing, distracting, and untruthful information that is neither tailored to their specific medical situations nor related to the risks, benefits, and details of the relevant abortion procedure.

## VI. IRREPARABLE HARM AND INJUNCTIVE RELIEF

80.     The Compelled Speech Laws impose an impermissible penalty and chill on Physicians' speech, subjecting Plaintiffs to irreparable harm.

81.     Enforcement of the Compelled Speech Laws will irreparably harm Plaintiffs by infringing on Physicians' rights to free speech under the First Amendment to the United States Constitution and by failing to provide clarity about the conduct the law prohibits and inviting arbitrary and discriminatory enforcement, in violation of the Due Process Clause of the Fourteenth Amendment.

82.     The Compelled Speech Laws subject Plaintiffs to irreparable harm for which there exists no adequate remedy at law, and threatens Plaintiffs (or, in the case of the AMA, its members) with substantial penalties for exercising their constitutional right to freedom of speech, which includes the right to refuse to speak a government-dictated message, and their constitutional right to due process, which includes the right to clarity regarding what conduct is prohibited by law and the right to be free from arbitrary and discriminatory enforcement of the law.

## CLAIMS FOR RELIEF

## COUNT I

## (Compelled Personhood Mandate—Violation of the First Amendment)

83.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 82.

84.     The Compelled Personhood Mandate violates Plaintiffs' rights under the First Amendment to the United States Constitution (as applied to North Dakota under the Fourteenth Amendment) by compelling Physicians, on pain of criminal penalty, to orally speak a content-based, viewpoint-based, controversial, and/or ideological government-mandated message that they would not otherwise recite, that violates accepted ethical standards and best practices in medical

care, that undermines Physicians' ability to provide their patients with the highest standard of medical care, and that contradicts Physicians' viewpoints.

## COUNT II

### (Compelled Reversal Mandate—Violation of the First Amendment)

85.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 84.

86.    The Compelled Reversal Mandate violates Plaintiffs' rights under the First Amendment to the United States Constitution (as applied to North Dakota under the Fourteenth Amendment) by compelling Physicians, on pain of criminal penalty, to orally speak a content-based, viewpoint-based, and/or controversial government-mandated message that they would not otherwise recite and refer their patients to government-created materials and government-sanctioned referrals about an experimental medical treatment that has not been proven safe and effective or approved by the FDA, that violates accepted ethical standards and best practices in medical care, that undermines Physicians' ability to provide their patients with the highest standard of medical care, and that contradicts Physicians' viewpoints.

## COUNT III

### (Void for Vagueness)

87.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 86.

88.    The Compelled Reversal Mandate does not provide Plaintiffs with clarity regarding how to comply both with its mandate to inform patients that medication abortion may be reversed and with a separate North Dakota law requiring that physicians only provide medication abortion in accordance with the protocol tested and authorized by the FDA, which does not describe a

process for reversal, failing to provide clarity about the conduct the law prohibits and inviting

arbitrary and discriminatory enforcement, in violation of the Due Process Clause of the Fourteenth

Amendment to the United States Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A. To issue a preliminary injunction against the Compelled Reversal Mandate and a permanent injunction against both of the Compelled Speech Laws restraining Defendants and their successors in office from enforcing the Compelled Speech Laws;

B. To enter a judgment declaring that the Compelled Speech Laws violate the First and Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983, and are thus unconstitutional and unenforceable;

C. To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and,

D. To grant such other and further relief as the Court deems just and proper.


Dated: June 25, 2019


Respectfully submitted,

Thomas A. Dickson
DICKSON LAW OFFICE
P.O. Box 1896
Bismarck, North Dakota 58502
tdickson@dicksonlaw.com
(701) 222-4400

Brian D. Vandenberg*
Leonard A. Nelson*
Erin G. Sutton*
AMERICAN MEDICAL ASSOCIATION
Office of General Counsel

Molly Duane*
Marc Hearron*
Autumn Katz*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor

330 N. Wabash Avenue
Chicago, IL 60611
brian.vandenberg@ama-assn.org
leonard.nelson@ama-assn.org
erin.sutton@ama-assn.org

*Counsel for Plaintiff American Medical Association*

New York, New York 10038
mduane@reprorights.org
mhearron@reprorights.org
akatz@reprorights.org
(917) 637-3631

Benjamin E. Marks
Steven A. Reiss
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
benjamin.marks@weil.com
steven.reiss@weil.com

Lauren Z. Alexander
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
lauren.alexander@weil.com

*Counsel for All Plaintiffs*

*Application for admission *pro hac vice* filed herewith

23